# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ARCHWAY COOKIES, LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-12323 (CSS)<br><br>(Jointly Administered)<br><br>Adversary No. 09-_____ (CSS) |
| | **ADVERSARY COMPLAINT** |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ARCHWAY COOKIES LLC, *et al.*, ON BEHALF OF THE DEBTORS' ESTATES,<br><br>Plaintiff,<br><br>v.<br><br>CATTERTON PARTNERS V, L.P., CATTERTON PARTNERS V OFFSHORE, L.P., CATTERTON COINVEST I, L.L.C., ARCHWAY & MOTHER'S COOKIE CO., INC., DOUGH CO., INSIGHT GROUP HOLDINGS, INC., JAMES MICHAEL CHU, WILLIAM J. LYNCH, CRAIG H. SAKIN, NIKHIL K. THUKRAL, MARK BERWICK, GEORGE KNOBLOCH, KEITH R. LIVELY, MARK MULTER, DONALD STANNERS; and JOHN DOES AND XYZ COMPANIES 1 - 10.<br><br>Defendants. | |

Plaintiff, the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee") of the debtors and debtors-in-possession in the captioned chapter 11 cases (collectively, the "Debtors"), on behalf of the Debtors' estates, by way of adversary complaint

---

[1] The Debtors in these cases are Archway Cookies LLC, a Delaware limited liability company, and Mother's Cake & Cookie Co., a California corporation.

against defendants Catterton Partners V, L.P., Catterton Partners V Offshore, L.P., Catterton Coinvest I, L.L.C., (collectively, "Catterton"), Dough Co., and Archway & Mother's Cookie Co., Inc. (collectively, the "Archway Parent"), Insight Group Holdings, Inc. ("Insight"), James Michael Chu, William J. Lynch, Craig H. Sakin, and Nikhil K. Thukral (collectively, the "Catterton Insiders"), Mark Berwick, George Knobloch, Keith R. Lively, Mark Multer, and Donald Stanners (collectively, the "Company Insiders"), and John Does and XYZ Companies 1-10 (all prior defendants listed above are collectively referred to as the "Defendants") hereby alleges as follows:

## <u>SUMMARY OF PROCEEDING</u>

1. As more fully described in this Adversary Complaint, the Defendants participated in, provided substantial assistance to, and were compliant in, a widespread accounting fraud that permeated throughout the Debtors' management. Plaintiff brings this action to right the wrongs that the Defendants committed.

2. The accounting fraud engaged in by the Defendants took a variety of forms during the extended period that it was implemented. However, none of the forms of the fraud were particularly sophisticated or ingenious. Rather, all the fraudulent transactions and reporting implemented or agreed to by the Defendants were for one solitary purpose -- to continue to inflate sales amounts and asset values in order to secure additional financing so that third parties, and not the Defendants, would fund the Debtors' losses.

3. The Defendants prolonged the fraud for as long as possible, all the while seeking to refinance the Debtors, turn around sales, and eventually divest themselves of the Debtors' business. The accounting fraud was the most convenient way of continuing to receive senior financing and trade credit to keep the business afloat. However, the fraud began to

unravel and the senior lender refused to continue to fund the Debtors. The Debtors' hoped-for refinancing never materialized and the fraud prevented the Debtors from selling the business as a going concern. The collateral damage was millions of dollars of increased claims of unsecured creditors, millions of dollars in administrative costs and expenses relating to the fraud, and the abrupt shutdown of the business.

4.      The fraudulent activity could not have succeeded for as long as it did without the control, participation and acquiescence of the Debtors' sole shareholder, term loan lender and subordinated lender -- Catterton. Catterton ensured that there was no independent or unbiased third party to monitor and protect the interests of the Debtors, or ensure that the Debtors were properly fulfilling the fiduciary duties that the Debtors owed to their creditors. Catterton's complete domination and control over the Debtors played a substantial part in the harm to the Debtors, the Debtors' estates, and ultimately to the unsecured creditors. Catterton must not be permitted to now hide behind the corporate formalities of the various entities that Catterton treated as a single business. Nor should Catterton's conduct be rewarded by allowing its claims to be paid ahead of, or *pari passu* with, the claims of the general unsecured creditors that Catterton harmed.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 151, 157, and 1334(b) and the Standing Order of the United States District Court for the District of Delaware referring to the Bankruptcy Judges of this District all cases and proceedings arising under the Bankruptcy Code.

6.      This Adversary Proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2).

7.     In the event this or any other appropriate Court finds any part of this Adversary Proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by this Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

8.     Venue in this District is properly laid pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises under and in connection with a case pending in this District under title 11 of the United States Code.

## THE PARTIES

9.     Plaintiff brings this proceeding, with the permission of the Court, on behalf of the Debtors' estates.

10.     Upon information and belief, defendant Catterton Partners V, L.P. is a Delaware Corporation with its principal place of business located in Greenwich, Connecticut. Catterton Partners V, L.P. is a 75.373% shareholder of the Debtor's parent company, Archway & Mother's Cookie Co., Inc.

11.     Upon information and belief, defendant Catterton Partners V Offshore, L.P. is a Cayman Islands Corporation with its principal place of business located in Greenwich, Connecticut. Catterton Partners V, L.P. is a 24.62% shareholder of Archway & Mother's Cookie Co., Inc.

12.     Upon information and belief, defendant Catterton Coinvest I, L.L.C. is a Delaware Corporation with its principal place of business located in Greenwich, Connecticut. Catterton Coinvest I, L.L.C. is a .001% shareholder of Archway & Mother's Cookie Co., Inc.

13.     Upon information and belief, defendant Insight Group Holdings, Inc. is a Nevada corporation with its principal place of business located in San Francisco, California.

14.     Upon information and belief, defendant Archway & Mother's Cookie Co., Inc. is a Delaware corporation with its principal place of business located in Battle Creek, Michigan. Archway & Mother's Cookie Co., Inc. is the ultimate parent of the Debtors.

15.     Upon information and belief, defendant Dough Co. is a Delaware corporation with its principal place of business located in Battle Creek, Michigan. Upon information and belief, Dough Co. is the current or former name of Archway & Mother's Cookie Co., Inc.

16.     Upon information and belief, defendant James Michael Chu is the current or former Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Principal of Catterton Partners. Upon information and belief, he resides in New Canaan, Connecticut.

17.     Upon information and belief, defendant Craig H. Sakin is the current or former Vice Chairman and a Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Senior Partner of Catterton. Upon information and belief he resides in Katonah, New York.

18.     Upon information and belief, defendant Nikhil K. Thukral is the current or former Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Principal of Catterton Partners. Upon information and belief, he resides in Riverside, Connecticut.

19.     Upon information and belief, defendant William J. Lynch is the current or former Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Principal of Catterton Partners. Upon information and belief, he resides in Connecticut.

20.     Upon information and belief, defendant Mark Berwick is the current or former Treasurer and a Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Principal of Insight. Upon information and belief, he resides in Gladwyne, Pennsylvania.

21.     Upon information and belief, defendant George Knobloch is the former President and Chief Operating Officer of Archway & Mother's Cookie Company, Inc. Upon information and belief, he resides in Kalamazoo, Michigan.

22.     Upon information and belief, defendant Keith R. Lively is the current or former Chairman, Chief Executive Officer and a Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Principal of Insight. Upon information and belief, he resides in Brentwood, Connecticut.

23.     Upon information and belief, defendant Mark Multer is the current or former Vice President of Finance and Treasury of Archway & Mother's Cookie Company, Inc. Upon information and belief, he resides in Battle Creek, Michigan.

24.     Upon information and belief, defendant Donald Stanners is the current or former Chief Financial Officer, Secretary and a Director of Archway & Mother's Cookie Company, Inc. and each of the Debtors. He is also a Principal of Insight. Upon information and belief, he resides in Tujunga, California.

25.     John Does and XYZ Companies 1 - 10 (the "Additional Parties") are persons and legal entities -- including, but not limited to, consultants, advisors, other directors and officers and members of the management team -- who aided and abetted, benefited from, or otherwise participated in the wrongful acts alleged in this Adversary Complaint. The identity of the Additional Parties will be determined through discovery in this proceeding.

## BACKGROUND

26.     On October 6, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Bankruptcy Court ordered the cases consolidated for procedural purposes only and granted the Debtors' request for joint administration. The Debtors continue in the possession of their properties and the management of their affairs as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

27.     On October 17, 2008, pursuant to Bankruptcy Code § 1102, the Office of the United States Trustee appointed the Committee. No trustee or examiner has been appointed in the Debtors' Chapter 11 cases.

28.     On October 17, 2008, the Committee selected Lowenstein Sandler PC and Cole, Schotz, Meisel, Forman & Lenard, P.A. as its counsel.

29.     The Committee was granted standing to pursue claims on behalf of the Debtors' estates by the Bankruptcy Court's Order, dated November 18, 2008, authorizing the Debtors to obtain post-petition financing (Docket No. 181) and by the Bankruptcy Court's Order, dated January 8, 2009, converting the Debtors' Chapter 11 cases to cases under Chapter 7 (Docket No. 393).

## FACTUAL BACKGROUND

30.     The Debtors, A&M Cookie Company Canada ("A&M Canada"), Archway Parent and A&M Canada Blocker Corp. ("A&M Blocker") (collectively referred to as "Archway"), are or were leading manufacturers and distributors of cookies in the United States and Canada.

31. Archway marketed its cookies under several nationally recognized brands, including 'Archway', 'Mother's' and 'Mrs. Allison's', and also produced cookies under private label programs for retailers such as Krogers and Target.

32. Archway's origins date back to 1936, beginning as a family-run business in Battle Creek, Michigan. The original founders sold the Archway business to one of its employees in 1962, who subsequently sold the business to two other employees in 1983. Archway was then sold to Specialty Foods Corporation in 1998. Specialty Foods previously acquired the 'Mother's' line of business, which was based in Oakland, California, where it had operated since 1914. In 2000, Specialty Foods sold both the 'Archway' and 'Mother's' businesses to Parmalat Finanziaria SpA ("Parmalat") for $250 million. In early 2005, Catterton purchased Archway from Parmalat.

33. The Debtors and A&M Canada are co-borrowers under a Loan and Security Agreement, dated January 28, 2005, with Congress Financial Corporation (New England), a predecessor to Wachovia Capital Finance Corporation (New England) ("Wachovia"). Dough Co. and A&M Blocker are guarantors under the loan agreement. The loan facility with Wachovia is comprised of first lien term loans in the original principal amount of $20 million and a $48.5 million revolving line of credit. The loan facility was subsequently amended.

34. The Debtors are co-borrowers under a second lien Term Loan and Security Agreement, dated January 28, 2005, with Catterton. Dough Co. is a guarantor under the loan agreement. The facility is comprised of second lien term loans in the original principal amount of $20 million. The loan facility was subsequently amended. The Debtors are also co-borrowers under a Subordinated Term Loan and Security Agreement, dated January 28, 2005, with Catterton. Dough Co. is a guarantor under the subordinated loan facility. The facility is

comprised of subordinated term loans in the original principal amount of $35 million. The subordinated facility was subsequently amended.

35.     Shortly after acquiring Archway from Parmalat, Catterton installed Insight to act as Catterton's agent and management firm for the day-to-day operations of Archway. Upon information and belief, Insight is or was an organization comprised of three individuals, Defendants Stanners, Lively and Berwick (collectively, the "Insight Insiders"). Insight's only corporate purpose is to manage those portfolio companies that are owned by Catterton. According to Insight's webpage "Insight is supported by Catterton Partners, a private equity fund specializing in acquisitions in consumer products industries." Catterton and Insight were each paid annual "management fees" by the Debtors. During the course of Catterton's ownership of Archway, Insight and Catterton collected a total of over $6 million in such fees from the Debtors.

36.     The board of Archway Parent is or was composed of Defendants Stanners, Lively, Berwick, Thurkral, Lynch, Chu, and Sakin. These same individuals are or were also the members of the boards of directors of each of the Debtors, A&M Canada and A&M Blocker. Defendants Stanners, Lively and Berwick served as officers for each of the Debtors, Archway Parent, A&M Canada and A&M Blocker. Not one member of any of the boards, or any officer, was independent. Every director and officer owed allegiance to Catterton -- either as a senior manager of Catterton, or as an Insight principal acting as Catterton's agent.

37.     Upon information and belief, Catterton and Insight failed to observe any corporate formalities among the Debtors and any of the Debtors' affiliates. No separate books or records exist for any of the entities, except Archway Parent. All financial accounting was prepared on a consolidated basis for Archway Parent, without any separate balance sheets or

financial information for the Debtors, or A&M Canada and A&M Blocker (collectively, the "Canadian Affiliates").

38.     Although Archway Parent held itself out as being simply a holding company for the stock of the Debtors and the Canadian Affiliates, Catterton failed to respect any corporate distinctions between Archway Parent and the Debtors, or the Canadian Affiliates. For instance, a number of collective bargaining agreements governing the Debtors' employees that were members of Teamsters unions were entered into directly by Archway Parent. Upon information and belief, Archway Parent also entered into a number of significant contractual obligations, including agreements for the manufacture, production and transportation of Archway products for both the Debtors and the Canadian Affiliates.

39.     Upon information and belief, the Canadian Affiliates operate Archway's largest bakery in Kitchner, Ontario and the Canadian Affiliates were, and continue to be, a profitable unit of the Archway business. The Canadian Affiliates have no senior level management separate and apart from Catterton, Archway Parent and the Debtors. Individuals at the Debtors and/or Archway Parent maintained records, computer files and related records necessary for nearly all the operations of the Canadian Affiliates. In addition, upon information and belief, the Debtors also were responsible for all of the marketing and sales efforts in connection with products produced and sold by the Canadian Affiliates.

40.     Prior and subsequent to the Petition Date, the Debtors performed substantial services for the benefit of the Canadian Affiliates, including accounting, back office billing, information technology support, finance support and related operations. Upon information and belief, prior to the Petition Date there was no agreement in place between the Debtors, the Canadian Affiliates and/or Archway Parent concerning what services the Debtors

would provide to the Canadian Affiliates, or what compensation the Debtors would receive in return for the services provided.

41.     Upon information and belief, the Debtors never received compensation for services the Debtors provided to Archway Parent and the Canadian Affiliates. The Debtors did not even enter into a post-petition Management Services Agreement until November 7, 2008 - a month after the Petition Date. The express purpose of the services agreement was to assist the Canadian Affiliates to operate on a stand-alone basis. Even under the post-petition services agreement, all notices required to be sent to the Canadian Affiliates must be sent to Catterton, rather than to any management personnel at the Canadian Affiliates.

42.     Upon information and belief, at the time of the acquisition from Parmalat and thereafter, the Debtors suffered significant financial losses and were or became insolvent. The Debtors had decentralized operations, incurred high fixed and variable costs, experienced excess plant capacity and had little new product development. Upon information and belief, Catterton attempted to remedy these and other operational issues in an attempt to return Archway to profitability and eventually sell the business.

43.     In April 2006, Archway announced that it would shutter its Oakland, California baking and distribution facilities for 'Mother's' brand products and move its operations to Kitchener, Ontario and Ashland, Ohio, resulting in the termination of approximately 230 employees. Upon information and belief, Archway also initiated an aggressive program of plant closings, route reductions, and operations.

44.     Upon information and belief, despite Catterton's attempts to effectuate cost-saving programs and return the Debtors to profitability, the business continued to bleed cash and the Defendants then conspired to implement a fraudulent scheme that would relieve

Catterton, as the Debtors' sole shareholder, from having to fund the Debtors' continuing losses. The scheme improperly shifted the funding of losses to Wachovia and the vendors that continued to extend trade credit to the Debtors.

45.     Upon information and belief, beginning at least as early as December 2007, the Catterton Insiders and Company Insiders (collectively, the "Insiders") began to manipulate and falsify Archway's financial records. One of the first major steps in this plan was to utilize the Debtors' relationship with a new "customer", Elite Logistics, to create fraudulent sales. Elite was a warehouse and transportation company with a warehouse facility in Ashland, Ohio. Elite entered into an agreement with the Debtors to store finished product produced in the Debtors' Ashland, Ohio manufacturing plant.

46.     Prior to December 2007, Elite had never been a customer of the Debtors, yet during the last week of December 2007, at least 23 shipments of product were sent to Elite's facility and booked as $1.2 million in sales, thus helping the Debtors meet their 2007 sales forecast. In reality, these shipments were only being held by Elite for later distribution, in 2008, to the Debtors' own network of independent contractors. Much of the product transferred to Elite eventually went stale and the Debtors were forced to replenish it with new product as orders from independent distributors slowly trickled in. A substantial amount of product had to be destroyed. Nonetheless, the sales recorded by the Debtors to Elite in December 2007 were never reversed.

47.     In calculating the Debtors' borrowing base, Wachovia considered receivables that were outstanding for more than 60 days to be ineligible receivables. The Elite receivable of $1.2 million was carried on the Debtors' books until approximately April 2008, when the invoice was voided and immediately reissued -- so that it would once again

fraudulently stay within Wachovia's borrowing base formula. Never once did title pass to Elite or did Elite actually purchase any of the Debtors' products. Neither Catterton, Insight nor the Insiders ever questioned how Elite (a warehouse operator to whom the Debtors had never previously sold product) suddenly became one of the Debtors' largest customers - at a time when the Debtors were suffering significant losses and desperately needed continued trade support from vendors, as well as asset-based financing from Wachovia.

48.     Upon information and belief, during early 2008, pressure on the Defendants increased to meet sales projections and obtain increasing amounts of funding from Wachovia to cover operational losses. The Insiders began to record phantom or "virtual" sales that were invoiced and booked, but for which the product was either never produced, or produced and shipped at different times and in different amounts than reflected on the Debtors' financial statements and borrowing base certificates. Upon information and belief, there was also pervasive "channel stuffing", which the Defendants either directed or were aware of, that allowed more product to be "sold" to a distributor than what the distributor ordered or was willing to purchase; with the understanding that the distributor could return the product (at full cost) to the Debtors after the close of the sales reporting period.

49.     In addition to the fraudulent sales reporting noted above, the Insiders also manipulated the Debtors' financial records by overstating the amount of inventory by at least $650,000. Upon information and belief, the Insiders intentionally inflated the value of the inventory to increase the amount of credit available under the financing facility with Wachovia.

50.     Upon information and belief, the Debtors' internal sales figures, including an aggregate running total of the Debtors' sales for the month, were sent to the Debtors' senior management team and the Insiders in the late morning of every business day. These internally

circulated monthly totals were significantly less than the sales figures reflected in the financial statements, borrowing base certificates, and other documents provided to Wachovia, the Debtors' auditors, and other parties. For instance, upon information and belief, on May 19, 2008, the daily borrowing base report submitted to Wachovia by the Debtors showed $1,006,447 in sales, while the internal sales report showed only $456,447 in sales.

51.     Upon information and belief, Keith Roberts, a Certified Public Accountant, was hired by the Debtors in October 2007 as an executive in the Debtors' finance department. Roberts was primarily responsible to assist the Debtors in having Ernst & Young audit the financial statements for the years ending 2005, 2006 and 2007. Upon information and belief, Roberts brought the fraudulent reporting to the attention of his superiors, including Defendant Multer, as early as April 2008.

52.     Upon information and belief, Defendant Multer and others at the Debtors were in nearly daily contact with the Insight Insiders, by telephone and through video conference capabilities between Battle Creek and Insight's San Francisco office. Upon information and belief, throughout the spring and summer of 2008, the Insiders had numerous conferences - often lasting for multiple hours - concerning the ongoing fraudulent accounting activity taking place at the Debtors.

53.     Upon information and belief, in or around May 2008, Defendant Multer advised Roberts that Insight and the Insiders were aware that the sales figures being reported to Wachovia and other parties, including Ernst & Young, were inflated. However, the Defendants had made a decision to continue to provide the fraudulent accounting statements and reports to Wachovia to induce Wachovia to continue financing the Debtors' losses, while the Defendants moved forward with efforts to refinance the Debtors and the Canadian Affiliates.

54.     These accounting irregularities were contemporaneously documented and brought to the attention of Insight and the Company Insiders through letters dated May 5, 2008 and July 28, 2008 (the "Whistleblower Letters"). The Whistleblower Letters document, among other things, that due to the Insiders' adjustments to daily sales numbers based on the borrowing base level needed, rather than the actual sales, there were approximately *120 fraudulent submissions* to Wachovia from June 5, 2007 through July 14, 2008. See July 28, 2008 electronic correspondence, annexed hereto as Exhibit A.

55.     Upon information and belief, throughout June and July 2008 the Insiders had multiple discussions concerning the fraudulent scheme and how the Insiders could avoid having the scheme exposed, or at least having its discovery delayed, until after the refinancing or sale of the Debtors' operations had taken place. Upon information and belief, on or about July 8, 2008, meetings were held in San Francisco, California at the offices of Insight between the Insight Insiders, Defendant Knobloch, and possibly others, concerning the fraudulent activity taking place at the Debtors and how the Defendants could avoid having the fraud discovered.

56.     Upon information and belief, in early July 2008, one or more telephone conferences took place between Roberts and Defendant Stanners specifically discussing the fraudulent financial statements and other wrongdoing, and what steps the Defendants would take to disclose the wrongdoing. Upon information and belief, notwithstanding multiple conversations and meetings among the Defendants relating to the fraudulent activity, the Defendants took no actions to disclose the fraudulent activity to Wachovia, its trade vendors that continued to extend credit, or any other party.

57.     Upon information and belief, once it became apparent to Roberts that the Defendants would not disclose and correct the fraud, at least not before a sale or refinancing of

the business, Roberts wrote a letter to Defendant Stanners on July 22, 2008, reiterating the concerns raised in the Whistleblower Letters and clearly stating that the fraudulent accounting issues had not been addressed or disclosed. See July 22, 2008 Letter, annexed hereto as Exhibit B.

58.     In August 2008, the Debtors, together with Wachovia and Catterton, discussed a potential sale of some of Archway's assets. Further to this discussion, Catterton (whose employees sat on the Debtors' board of directors) instructed Insight to retain Alvarez and Marsal North America, LLC ("Alvarez") to assist with the restructuring and sale process. In or around August 2008, Alvarez sent restructuring professionals to Archway's headquarters. See the Statement of Facts in Support of Chapter 11 Petitions and First Day Motions at ¶13 (the "Statement of Facts") (Docket No. 12).

59.     Although the Insight Insiders (and likely other Defendants) had copies of the Whistleblower letters from May 2008 and July 2008, the Whistleblower Letters were not provided to Alvarez until early September 2008. See Statement of Facts at ¶14. Upon learning of the Whistleblower Letters, Alvarez began an investigation into the accounting irregularities, sending forensic accountants to Archway to review the Debtors' and Archway Parent's records and interview key employees.

60.     The initial investigation by Alvarez was sufficient to confirm the allegations in the Whistleblower Letters - specifically, that certain of the Insiders had falsified borrowing base calculations provided to Wachovia; had "channel-stuffed" in distribution channels in the western and mid-western United States to increase sales figures; and had improperly reclassified expenses from the profit and loss statements to the balance sheets to

increase monthly EBITDA. Alvarez also noted that the accounting irregularities appeared to include a large, year-end sale.

61.     Upon information and belief, despite the fact that the accounting fraud was well known to the Insiders, Insight and Catterton, none of these parties notified Wachovia, any of the vendors extending credit to the Debtors, or any other party. In fact, notwithstanding the fiduciary duties and other obligations the Insiders owed to the Debtors and the Debtors' creditors, they all remained silent.

62.     Relying upon the falsified financial statements prepared by the Defendants, Wachovia agreed to extend the Debtors substantial additional financing in late 2007 and early 2008. Upon information and belief, Wachovia extended a total of $15 million in additional financing to the Debtors between December 2007 and May 2008 through three amendments to the loan facility.

63.     Upon information and belief, the Defendants participated and/or were complicit in the accounting fraud in order to secure additional financing from Wachovia and others through fraudulent means. The Defendants also attempted to secure additional moneys from a new lending prospect, which was being solicited to provide tens of millions of dollars to the Debtors, to refinance Wachovia's facility and pay down a portion of Catterton's debt. Upon information and belief, the new potential lender turned down the investment opportunity after becoming aware of the accounting irregularities.

64.     Upon information and belief, it was a former employee of the Debtors that first informed Wachovia of the fraudulent accounting scheme in early September 2008. Upon information and belief, once the true financial condition of the Debtors was known, Wachovia determined that millions of dollars of inventory and receivables, for which Wachovia previously

gave the Debtors credit for under the loan facility, were in fact ineligible under the borrowing base. Wachovia confirmed that it was in an over-advance situation under its loan documents and refused to make further advances. This situation precipitated a chain of events that included an immediate shutdown of the Debtors' operations, except for the Canadian Affiliates, and the termination of all of the Debtors' employees.

65.  The Defendants' misdeeds caused the Debtors to incur substantial damages, including millions of dollars in costs associated with the forensic investigation into the accounting fraud; an increase in trade payables of at least $4 million between the end of 2007 (when the fraudulent plan was fully implemented) and the Petition Date; substantial costs associated with the emergency bankruptcy filing; the retention of Focus Management Group as crisis manager; the fees and interest paid in connection with the Debtors' post-petition financing facility; and the additional costs and expenses, and potential liability, in connection with the class action filed by terminated employees for WARN Act violations. See the Complaint, captioned Austen v. Archway Cookies LLC et al., Adversary Proceeding No. 08-51530 (CSS).

66.  The Debtors do not have any outside directors. Upon information and belief, all of the management decisions were made by Catterton, its agent, Insight and the Insiders, including the decision to engage in and facilitate fraudulent accounting practices. Catterton, Insight and the Insiders were interested in protecting their financial stake in the Debtors and acted to further that self-interest. There was no independent officer or director in place that could have acted free from conflict and in the best interests of the Debtors and their estates.

67.  The Defendants should be held accountable for their wrongful conduct and self-dealing actions, and the substantial damages resulting from those actions. The Committee,

therefore, respectfully requests relief from this Court, to right the wrongs committed by the Defendants.

## FIRST COUNT
### (Breach of Fiduciary Duty - Insight and the Insiders)

68.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

69.     Upon information and belief, Insight and the Insiders, through the misconduct described above, derived personal financial benefits and breached their fiduciary duties, including, but not limited to, breaching: (a) their duties of loyalty; (b) their duties of care; and (c) their duties of good faith.

70.     Upon information and belief, certain Insiders acted with *scienter* and their misconduct was intentional and/or in knowing violation of law.  The conduct by these Insiders cannot be attributed to any rational business purpose, and they knew or recklessly disregarded the fact that they were acting in a way that was adverse to the interests of the Debtors and the unsecured creditors.

71.     Upon information and belief, Insight and the Insiders also breached their fiduciary duties through bad faith and gross negligence, such as by failing to supervise, monitor, oversee and/or properly investigate the actions of other Insiders or the financial affairs of the Debtors.

72.     Because the Debtors were insolvent at the time of these wrongful acts, Insight and the Insiders owed these fiduciary duties to the Debtors and the Debtors' unsecured creditors.

73.     As a result of these breaches of fiduciary duty, the Debtors, the Debtors' estates and the Debtors' creditors have all been damaged.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that Insight and the Insiders are liable, jointly and severally, to the Debtors' estates for compensatory and punitive damages;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

<u>**SECOND COUNT**</u>
**(Aiding and Abetting Breach of Fiduciary Duty - Insight and Catterton)**

74.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

75.     As discussed above, the Insiders owed a fiduciary duty to the Debtors and the unsecured creditors.

76.     The Insiders breached their fiduciary duties to the Debtors and the unsecured creditors.

77.     Insight and Catterton knew that the Insiders were engaged in breaches of fiduciary duty and other misconduct.

78.     Insight and Catterton gave substantial assistance and encouragement to the Insiders' breaches of fiduciary duty, and failed to properly monitor, oversee and investigate their breaches of fiduciary duty.

79.     As a result of these acts and omissions by Insight and Catterton, the Debtors, the Debtors' estates and the unsecured creditors have all been damaged.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that Insight and Catterton are liable, jointly and severally, to the Debtors' estates for compensatory and punitive damages;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

## THIRD COUNT
### (Waste of Corporate Assets/Ultra Vires Acts - Insiders)

80.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

81.     By reason of the foregoing, the Insiders permitted the use of the Debtors' assets for ultra vires purposes and/or for the personal benefit of the Insiders, Catterton and Insight.

82.     By reason of the foregoing, the Insiders engaged in waste of corporate assets and ultra vires acts.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that the Insiders are liable, jointly and severally, to the Debtors' estates for compensatory and punitive damages;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

## FOURTH COUNT
### (Fraud - Catterton, Insight and the Insiders)

83.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

-21-

89.     Catterton, Insight and the Insiders owed: (a) a fiduciary duty to the Debtors; and (b) a fiduciary duty to the Debtors' unsecured creditors by reason of the Debtors' insolvency.

90.     Catterton, Insight and the Insiders failed to disclose, and intentionally concealed, material facts regarding the Debtors' financial condition under circumstances where they knew that creditors were being induced to extend additional credit on the basis of mistaken knowledge.

91.     The lenders' and creditors' reliance upon these omissions of material fact, which directly and proximately caused the creditors to suffer substantial damages, was justifiable and foreseeable.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that Catterton, Insight and the Insiders are liable, jointly and severally, to the Debtors' estates for compensatory damages;

(ii)     Award punitive damages against Catterton, Insight and the Insiders;

(iii)     Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iv)     Grant such other and further relief as the Court deems just and proper.

## SIXTH COUNT
### (Unjust Enrichment - Catterton, Insight and the Insiders)

92.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

93.     By falsifying the Debtors' financial statements, Catterton, Insight and the Insiders artificially prolonged the operations of the Debtors for more than a year, resulting in the Debtors incurring substantial additional first lien debt and trade debt.

94. As a result of the Debtors' prolonged existence, Catterton, Insight and the Insiders used the credit provided by trade vendors and Wachovia, instead of Catterton funding the Debtors' losses itself in the form of capital contributions. Accordingly, the Defendants have been unjustly enriched at the expense of the Debtors and unsecured creditors.

95. The unjust enrichment of the Defendants was inequitable, and in violation of fundamental principles of justice, equity and good conscience.

96. Accordingly, the Debtors' estates and the creditors are entitled to restitution.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i) Direct that any sums paid by the Debtors, directly or indirectly, to Catterton, Insight and the Insiders during the period of fraudulent activity, be returned to the estates and avoided;

(ii) Direct that Catterton, Insight and the Insiders are liable, jointly and severally, to the Debtors' estates;

(iii) Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iv) Grant such other and further relief as the Court deems just and proper.

## SEVENTH COUNT
### (Piercing the Corporate Veil - Archway Parent and Catterton)

97. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

98. Upon information and belief, Catterton and Archway Parent exercised, and continue to exercise, complete control and dominion over all the Debtors and the Canadian Affiliates.

99.     Upon information and belief, some or all of the shareholders, officers and directors of Archway Parent, Catterton, each of the Debtors, and each of the Canadian Affiliates are the same individuals.

100.     Upon information and belief, Catterton and Insight failed to observe any corporate formalities among the Debtors and any of the Debtors' affiliates. No separate books or records exist for any of the entities, except Archway Parent. All financial accounting was prepared on a consolidated basis for Archway Parent, without any separate balance sheets or financial information for the Debtors, or the Canadian Affiliates.

101.     Upon information and belief, the Archway Parent is merely a "shell" company for the Debtors and the Canadian Affiliates, and Catterton failed to respect any corporate distinctions between the Archway Parent and the Debtors or the Canadian Affiliates. For instance, upon information and belief, Archway Parent entered into a number of significant contractual obligations, including the Debtors' collective bargaining agreements, and agreements for the manufacture, production and transportation of Archway products for both the Debtors and Canadian Affiliates.

102.     Upon information and belief, the Canadian Affiliates have no senior level management separate and apart from Archway Parent and the Debtors. Upon information and belief, the Canadian Affiliates are or were completely dependent on the Debtors for management personnel, accounting, sales, information technology, payroll and office support. Moreover none of the Archway entities had any separate accounting books or financial statements. In addition, upon information and belief, under the direction of Catterton, Archway Parent utilized services and employees of the Debtors without just compensation to the Debtors' estates.

103. Fundamental unfairness and injustice will result to the Debtors and the creditors if Archway Parent and Catterton are not held liable for their unlawful conduct in siphoning resources and assets of the Debtors for their own benefit that should have been used in payment of the Debtors' obligations.

104. By reason of the foregoing, Plaintiff should be permitted to pierce the corporate veil and hold Catterton and Archway Parent responsible, jointly and severally, to the Debtors' estates for damages caused by the Defendants.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i) Direct that the Archway Parent and Catterton are liable, jointly and severally, for all of the Debtors' debts;

(ii) Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii) Grant such other and further relief as the Court deems just and proper.

## EIGHTH COUNT
### (Usurping Corporate Opportunity - Insight and the Insiders)

105. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

106. As discussed above, Insight and the Insiders owed a fiduciary duty to the Debtors and their unsecured creditors.

107. Insight and the Insiders usurped the corporate opportunities of the Debtors by providing employees and services of the Debtors to the Archway Parent and its Canadian Affiliates without compensation to the Debtors.

108.     Insight and the Insiders also usurped the corporate opportunities of the Debtors by permitting the use of the Debtors' assets for _ultra_ _vires_ purposes and/or for the personal benefit of the Insiders, Catterton and Insight.

109.     By reason of the foregoing, the Debtors, the Debtors' estates, and the unsecured creditors have all been damaged.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that any sums paid by the Debtors, directly or indirectly, to Insight and the Insiders during the period of fraudulent activity, be returned to the estates and avoided;

(ii)     Direct that Insight and the Insiders are liable, jointly and severally, to the Debtors' estates;

(iii)     Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iv)     Grant such other and further relief as the Court deems just and proper.


**NINTH COUNT**
**(RICO Violations under 18 U.S.C. § 1962(c) and (d) - Insiders, Catterton and Insight)**

110.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

111.     Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964 (c).

112.     By associating with each other for purposes that included engaging in fraudulent accounting practices, the Defendants constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in, and the activities of which affected, interstate commerce for a period of at least fifteen months.

113.    Each of the Defendants was associated with the enterprise and did conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c) by falsifying the Debtors' financial statements and related documents in a total of approximately 120 submissions transmitted to Wachovia via mail and/or wire from at least June 5, 2007 through July 14, 2008.

114.    The predicate acts of mail fraud, wire fraud and/or bank fraud were related because they involved an orchestrated plan by the Defendants to relieve Catterton, as the Debtors' sole shareholder, from having to fund the Debtors' continuing losses. The scheme improperly shifted the funding of losses to Wachovia and the vendors that continued to extend trade credit to the Debtors.

115.    The predicate acts of each of the Defendants reveal a threat of continuing criminal activity because some or all the Defendants continue to operate a unit of the enterprise through the Canadian Affiliates.

116.    In violation of 18 U.S.C. § 1962(d), each of the Defendants conspired and agreed to commit and/or assist in the commission of at least two predicate acts of mail fraud, wire fraud and/or bank fraud, as set forth in more detail above, with the knowledge and intent that such acts were in furtherance of the conspiracy's unlawful activities.

117.    Thus, by reason of the violation of 18 U.S.C. § 1962(c) committed by all of the Defendants and the conspiracy of all the Defendants to violate RICO in violation of 18 U.S.C. § 1962(d), the Debtors, the Debtors' estates, and the unsecured creditors were injured in an amount to be proven at trial, which amounts shall be automatically trebled pursuant to 18 U.S.C. § 1964(c), together with costs and attorneys' fees.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that Catterton, Insight and the Insiders are liable, jointly and severally, to the Debtors' estates for three times the damages suffered as a result of the Defendants' acts and omissions;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

## TENTH COUNT
### (Recharacterization - Catterton)

118.    The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

119.    Upon information and belief, as more fully described above, beginning in 2007 Catterton knew, or should have known, that the Debtors were falsifying their financials statements, and that if the true state of the Debtors' financial condition was known the Debtors would be unable to secure financing necessary for the Debtors to operate.  During this period, Catterton advanced additional funds to the Debtors with the intent that Debtors' sales would improve, or the business would be sold, before the accounting fraud came to light.

120.    While the funds advanced by Catterton (the Debtors' sole shareholder) to the Debtors were cloaked under the guise of a loan to the Debtors, they were truly in the nature of an equity investment.

121.    Pursuant to the equitable powers conveyed to the Bankruptcy Court by Bankruptcy Code §105, the Bankruptcy Court can look beyond the form of a transaction and consider the transaction's substance to determine whether it should be recharacterized from debt to equity.

122.     In order to achieve justice, in light of Catterton's misconduct, advances under the Term Loan and Security Agreement and the Subordinated Term Loan and Security Agreement should be deemed to be equity interests and subordinated to the claims of unsecured creditors.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)      Recharacterize any loans from Catterton to the Debtors as equity;

(ii)     Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)    Grant such other and further relief as the Court deems just and proper.

## ELEVENTH COUNT
### (Equitable Subordination - Catterton)

123.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

124.     Based on the conduct set forth above, Catterton took advantage of it's inside position and complete control and domination over the Debtors.

125.     Catterton engaged in inequitable conduct including, but not limited to, participating in and/or acquiescing in a fraudulent accounting scheme. Catterton's conduct injured the Debtors' estates and unsecured creditors by inducing Wachovia and vendors to continue to extend credit as part of the prolonged fraud to improperly continue the Debtors' operations.

126.     As a result of Catterton's misconduct, the Debtors' estates have been injured.

127.     Equitably subordinating Catterton's claims is consistent with the provisions of the Bankruptcy Code.

128. Catterton's claims should be equitably subordinated to the claims of the general unsecured creditors pursuant to Bankruptcy Code §510.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)    Equitably subordinate Catterton's claims against the Debtors to the claims of unsecured creditors;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)    Grant such other and further relief as the Court deems just and proper.

## TWELFTH COUNT
### (Preference under Bankruptcy Code § 547(b) - Catterton and Insight)

129. The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

130. Within two years of the Petition Date, Catterton and/or Insight received "transfers" from the Debtors, as those terms are used within Bankruptcy Code §547(b). The transfers to Catterton and/or Insight included, but were not limited to, all forms of compensation received by Catterton and/or Insight, as well as obligations incurred by the Debtors to the Canadian Affiliates at the direction of and for the benefit of Catterton.

131. Such transfers to Catterton and/or Insight were made within one year of the Petition Date, while the Debtors were insolvent.

132. Catterton and Insight are insiders of the Debtors pursuant to Bankruptcy Code §101(31) and the transfers were made for the benefit of Catterton and/or Insight.

133. By reason of the foregoing, the transfers constitute avoidable preferential transfers under Bankruptcy Code §547(b).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that any sums paid by the Debtors to Catterton, directly or indirectly, while the Debtors were insolvent, be avoided and returned to the Debtors' estates pursuant to Bankruptcy Code §550;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

## THIRTEENTH COUNT
### (Fraudulent Conveyance under Bankruptcy Code §548(a)(1) - Catterton and Insight)

134.    The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein

135.    Within two years of the Petition Date, the Debtors incurred "obligations" and Catterton and/ or Insight received "transfers" from the Debtors, as those terms are used within Bankruptcy Code §548(a)(1). The transfers to the Defendants included, but were not limited to, all forms of compensation received by Catterton and/or Insight, as well as obligations incurred by the Debtors, including obligations incurred by the Debtors to the Canaidan Affiliates at the direction of and for the benefit of Catterton.

136.    The Debtors, through the Insiders, made these transfers with actual intent to hinder, delay or defraud, within the meaning of Bankruptcy Code §548(a)(1)(A), to entities to which the Debtors were or became indebted to on or after the date of the transfers.

137.    The Debtors received less than a reasonably equivalent value, within the meaning of Bankruptcy Code §548(a)(1)(B)(i), in exchange for the transfers.

138.    The Debtors were insolvent, within the meaning of Bankruptcy Code §548(a)(1)(B)(ii)(I), on the date of the transfers or became insolvent as a result of the transfers.

139.     At the time of the transfers, the Debtors were engaged in business or a transaction, within the meaning of Bankruptcy Code §548(a)(1)(B)(ii)(II), for which any property remaining with the Debtors was an unreasonably small capital.

140.     At the time of the transfers, the Debtors, through the Insiders, intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtors' ability to pay as such debts matured, within the meaning of Bankruptcy §548(a)(1)(B)(ii)(III).

141.     Neither Insight nor Catterton satisfy the good-faith transferee requirements within the meaning of Bankruptcy Code §548(c).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that any sums paid by the Debtors to Catterton and Insight, directly or indirectly, within two years of the Petition Date, be avoided and returned to the Debtors' estates pursuant to Bankruptcy Code §550;

(ii)     Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)     Grant such other and further relief as the Court deems just and proper.

## <u>FOURTEENTH COUNT</u>
**(Fraudulent Conveyance under § 544 and Applicable State Law - Catterton and Insight)**

142.     The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

143.     By reason of the foregoing, the transfers, as set forth in Count Thirteen above, constitute fraudulent transfers to Defendants Catterton and Insight within the meaning of applicable state laws, including but not limited to the Uniform Fraudulent Transfer Act (UFTA).

144.     By reason of the foregoing, the transfers constitute avoidable fraudulent transfers under Bankruptcy Code § 544(b).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that any sums paid by the Debtors to Catterton and Insight, directly or indirectly, within two years of the Petition Date, be avoided and returned to the Debtors' estates pursuant to Bankruptcy Code §550;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

## FIFTEENTH COUNT
### (Lien Avoidance - Catterton)

145.    The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

146.    Upon information and belief, Catterton may not have a properly perfected security interest in certain assets of the Debtors' estates, including, but not limited to, (i) life insurance policies with a cash surrender value of more than $4 million; (ii) real property located at 1240 Claremont Avenue, Ashland, Ohio (valued by the Debtors at $2.5 million); (iii) commercial tort claims; (iv) foreign trademarks; (v) deposit accounts; and (vi) vehicles.

147.    Accordingly, Catterton's liens, if any, should be avoided pursuant to Bankruptcy Code § 544.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Direct that Catterton's liens be avoided;

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

## SIXTEENTH COUNT
### (Claim Objection - Catterton)

148.    The Committee repeats the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth at length herein.

149.    Pursuant to §502(d) of the Bankruptcy Code, "the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of [the Bankruptcy Code] or that is a transferee of a transfer avoidable under section ... 544, 545, 547, 548, [or] 549 of [the Bankruptcy Code], unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section ...542, 543, 550 or 553 of [the Bankruptcy Code]."

150.    Catterton (a) received property recoverable under Section 542, 543, 550 or 553 of the Bankruptcy Code, or (b) is a transferee of one or more transfers that are avoidable under section 544, 545, 547, 548 or 549 of the Bankruptcy Code.  In addition, Catterton has not paid the amount, or turned over any such property, for which they are liable under section 542, 543, 550 or 553 of the Bankruptcy Code.

151.    The Court should disallow any claim of Catterton unless and until Catterton has paid the amount, or turned over the property, for which Catterton is liable.

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

(i)     Disallow any claim of Catterton pursuant to Bankruptcy Code § 502(d)

(ii)    Award the Plaintiff costs of suit and reasonable attorneys' fees; and

(iii)   Grant such other and further relief as the Court deems just and proper.

Dated: January 20, 2009

COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.

By: _Karen M. M^cKinley_
Karen M. McKinley (No. 4372)
1000 N. West Street, Suite 1200
Wilmington, DE 19899
Phone: (302) 295-4978

-and-

LOWENSTEIN SANDLER PC
Kenneth A. Rosen, Esq.
Jeffrey Prol, Esq.
Scott Cargill, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Co-Counsel to the Official Committee of
Unsecured Creditors*